## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA N. VICCARONE, | ) | CASE NO. 1:20CV-00782 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Samantha N. Viccarone, ("Plaintiff" or "Viccarone"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On  June 22, 2017, Viccarone filed an application for SSI, alleging a disability onset date of January 1, 1994[2] and claiming she was disabled due to agoraphobia, severe anxiety, high blood pressure, and asthma.  (Transcript ("Tr.") at  15, 48, 61, 118.)  The application was denied initially and upon reconsideration, and Viccarone requested a hearing before an administrative law judge ("ALJ").  (Tr. 74-6, 80-2, 83-5.)

On December 12, 2018, an ALJ held a hearing, during which Viccarone, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 15.)  On  February 27, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 12-31.)  The ALJ' s decision became final on February 10, 2020, when the Appeals Council declined further review.  (Tr. 1.)

On April 10, 2020, Viccarone filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 18, 19.)  Viccarone asserts the following assignments of error:

(1)     The ALJ Committed Plain Error by Stopping Samantha's Testimony Because Her Hearing Started Late, Due to Scheduling Issues Caused by the Office of Disability Adjudication and Review, Which Deprived Samantha of a Substantial Right. See Tr. 41.

(2)     The ALJ's Determination That the Opinions of the State Evaluators Were "Partially Persuasive" and That the Opinion of Samantha's Primary Provider Was "Unpersuasive" Constituted Error and is Not Supported by Substantial Evidence. See Tr. 26-8.

(3)     The ALJ Committed an Error of Law and the Decision is Not Supported by Substantial Evidence as the ALJ Improperly Concluded that Samantha does not Satisfy Listing 12.06, for Failure to Satisfy the "Paragraph B" Criteria. Tr. 18-20.

---

[2]      At her hearing, Viccarone's attorney acknowledged that the appropriate onset date was the date of application, June 22, 2017.  (Tr. 35.)

(4)     The ALJ Erred by Not Following the Requirements of SSR 96-8p When Making the RFC Finding, and the RFC Finding is Not Supported by Substantial Evidence. See Tr. 20-26.

(5)     The ALJ Erred by Failing to Follow SSR 16-3p When Assessing Samantha's Credibility, and the ALJ's Credibility Finding is Not Supported by Substantial Evidence.

(Doc. No. 16 at 4.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Viccarone was born in August 1988 and was 28 years old, which is defined as a younger individual age 18-49 under social security regulations, on the date the application was filed.  (Tr. 26, 58.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a high school education and is able to communicate in English.  (*Id.*)  She no past relevant work.  (Tr. 26.)

### B.     Relevant Medical Evidence[3]

#### 1.     Mental Impairments

Viccarone was identified as a child with a developmental handicap at the beginning of her second grade year, and was determined to be eligible to continue services for a child with a developmental handicap at the start of the fifth grade.  (Tr. 202-3.)

On February 25, 2003, Viccarone was assessed with the Wechsler Abbreviated Scale of Intelligence.  (*Id*. at 204.)  Viccarones' full-scale intelligence quotient ("IQ") was placed at 73, in the "borderline" range.  (*Id.*)  She received a score of a 63 in performance intelligence, defined as "the ability to think and reason with words," which plcaced her in the "mildly delayed" range for this skill

---

[3]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

set. (*Id*.)

On April 16, 2003, when  when Viccarone was fourteen years old and in eighth grade, she received an Individualized Education Plan ("IEP"), which addressed goals in the areas of work/study skills, reading comprehension, written expression, and math. (*Id*. at. 202.) She received resource room instruction in language arts, math and intervention, and was attending an inclusion classroom for social studies and science.  (*Id*.)  She was below the seventh grade proficiency standard in the areas of reading, math, citizenship, and science, despite accommodations of reading assistance, clarifying directions, and use of a calculator and math grid.  (*Id*.)  She had also scored below proficient in  all areas on the sixth grade proficiency test, despite accommodations of extra time and having the test read to her. (*Id*.)  Her social studies teacher indicated that Viccarone would do poorly if assignments or quizzes/tests were not read or explained orally.  (*Id*. at 209.)  Her speech language pathologist noted Viccarone displayed difficulty recalling sentences of increasing length and complexity. (*Id*. at 212.)

On August 1, 2011, Kenneth Gruenfeld, Psy.D. conducted a psychological evaluation of Viccarone at the request of the Ohio Division of Disability Determination ("DDD") (*Id*. at  232-39.) She reported that she graduated high school through an online program because she could not go to school due to mental health issues. (*Id*. at 233.)  She stated that she struggled in reading, writing, spelling, and math.  (*Id*.) She reported a history of panic attacks which began at the age of thirteen, and were triggered by the journey to "places" or  weather related storms.  (*Id*.)  She reportedly was not currently receiving mental health treatment, but took Ativan in situations where she was likely to become anxious, and Zoloft because her doctor believed she suffered from depression.  (*Id*. at 234.) She stated the Ativan helped with her anxiety, and denied all current symptoms of depression.

4

(*Id*.) Dr. Guenfeld observed no symptoms of anxiety during his evaluation, and Viccarone stated she was not anxious at that time.  (*Id*. at 235.)  Dr. Gruenfeld administered the Weschler Adult Scale of Intelligence, which placed her full-scale intelligence quotient at 77, in the "borderline" range of intellectual functioning. (*Id*. at 234.)  He noted her speech was normal, logical and content-directed, and described her as "polite and cooperative." (*Id*. )  Viccarone reported that she was unable to shop for groceries, manage money, manage her medications, or complete chores such as vacuuming and cleaning without assistance. (*Id*.)  She reported she was able to dress and bathe herself on a daily basis, but often skipped those activities when anxious. (*Id*.) Dr. Gruenfeld opined that Viccarone "may have problems" understanding, remembering, and carrying out information, and in maintaining attention, concentration, persistence, and pace. (*Id*. at 236.)

On June 18, 2016, Dr. Deborah Koricke performed a second psychological evaluation of Viccarone at the request of the DDD. (*Id*. at 240-6.)  Her father drove her to the evaluation. (*Id*. at 240.) She reported living with her parents at the time of the evaluation and being unable to work because she could not leave her home due to severe anxiety. (*Id*. at 241.)  Dr. Koricke noted she displayed restricted affect, and Viccarone described her typical mood as depressed.  (*Id*. at 243.) She was not engaged in counseling or mental health treatment. (*Id*. at 242.)  She described her mood at the evaluation as anxious, and stated she had not slept the previous night due to anticipation of the evaluation. (*Id*. at 243.)  However, Dr. Koricke observed "she did not appear anxious during [the] evaluation." (*Id*.)  Her plan for the future was "I want to get out more and not be scared all the time." (*Id*.) On a typical day, she reported going to bed around 1 A.M. and waking around 2 P.M., packing her mother's lunch for her, and spending the remainder of the day helping her father with yard work and dinner.  (*Id*. at 244.) Her hobbies included playing with her dogs and helping her father with yard

work.  (*Id*.)  Dr. Koricke opined that Viccarone would be expected to have problems with persistence and pace in the workplace due to her depression and agoraphobia, and that her poorly-controlled symptoms would result in "moderate to severe problems" responding appropriately to supervision and co-workers. (*Id*.)  Dr. Kopicke also opined that "exposure to work pressures may increase her Agoraphobia and depression and she does not have effective coping skills to manage these conditions without counseling and medication management."  (*Id*.)

On April 5, 2017, Viccarone began treatment for her mental health conditions, with a principle diagnosis of agoraphobia, at the Far West Center. (*Id*. at 258.) She had not left her home in approximately one year and insisted that her grandmother not leave the room due to severe anxiety. (*Id*. at 263, 268, 270.)  She reported needing to take three Xanax pills just to be able to get out of her home to make it to her appointment that day.  (*Id*.)  Her assessor observed she had appropriate behavior and eye contact, but appeared dissociated, pale, and depressed. (*Id*. at 270.)  She reported symptoms including depressed mood, loss of interest or pleasure in activities, increased appetite with weight gain, and worthlessness. (*Id*. at 263.)  Loud noises such as thunder and fireworks caused her to panic. (*Id*. at 263-4.) She was unsure on her plans for her education, career, or family life, but stated that she would like to be able to leave her home and be "ok" in social situations. (*Id*. at 267.) Her insight and judgment were noted to be poor, and she displayed blunted affect and anxious mood. (*Id*. at 268.)  She was diagnosed with agoraphobia and major depression, mild.  (*Id*.)  Her assessor recommended individualized therapy and psychiatric review of her medications.  (*Id*.)

On July 11, 2017, Viccarone's counselor at the Far West Center noted Viccarone "seem[ed] excited to share that she had been able to attend fireworks with her parents" while wearing noise cancelling headphones.  (*Id*. at 282.)  She also reported leaving her home to go to her grandmother's

6

home twice since her last appointment.  (*Id*.)  She shared that she wanted to work on her separation anxiety, and she did not like to be in the doctor's office alone, even when she knew her father was in the waiting room.  (*Id*.)

On July 25, 2017, Viccarone had a medication management appointment, and reported that increasing her dosage of Abilify at the prior visit had been helpful.  (*Id*. at 284.)  She reported that she felt "a lot better," but still had fearful thinking.  (*Id*.)

On July 26, 2017, Viccarone reported to her counselor that her negative thoughts were decreasing and her anxiety symptoms primarily under control, except when she was separated from her parents. (*Id*. at 288.)

On July 31, 2017, Viccarone completed a function report, stating that her anxiety prevented her from leaving her home and limited her ability to be separated from her family if she did leave the house.  (*Id*. at 150-57.)  Viccarone stated that she did not handle stress or changes in routine.  (*Id*. at 156.)  She reported that she got along "really well" with authority figures, and she denied experiencing any problems getting along with family, friends, and neighbors.  (*Id*. at 155-56.)  Viccarone stated that she could pay attention "really well" and did not report any difficulties with memory, concentration, understanding, and following spoken instructions.  (*Id*. at 155.)  She reported that during a typical day, she made food for her mother and watched television.  (*Id*. at 151.)  She reported that she was able to care for herself, prepare her own meals, take medicine without reminders, shop for clothes and food in stores and online, and listen to music.  (*Id*. at 151-54.)  She bathed her pets and could give them medicine, but her sister walked the pets and fed them. (*Id*. at 151.)  She could perform some yard work and laundry, but needed encouragement to do so.  (*Id*. at 152.)  She was unable to go out alone and was too scared to drive a car.  (*Id*. at 153.)

August 9, 2017, Viccarone reported to her counselor that she had been able to go to her grandmother's home without her parents on one occasion. (*Id*. at 290.) She was challenging herself to spend time away from her home without her parents present. (*Id*.)

On August 26, 2017, Viccarone reported to her counselor that she had been able to visit family who lived over an hour away from her without significant anxiety during the drive, but had been unable to participate in art therapy out of fear that her father will walk out of the lobby. (*Id*. at 294.)

On August 29, 2017, Viccarone met with a counselor before attempting to attend the Art Therapy group. (*Id*. at 296.) She reported being too anxious to attend the group, and explained a change in her medication was causing her head to shake without her being aware of it. (*Id*. at 296.) She was able to speak with a nurse at Near West, and her medication was adjusted. (*Id*. at 297.)

On September 11, 2017, medication management notes state that Viccarone's dosage of Abilify was lowered, and her tremors abated. (*Id*. at 300.) She reported, "I am good, really good." (*Id*.) Her father noted she was smiling more and going out with him. (*Id*.)

On September 19, 2017, Viccarone reported to her counselor that she had been able to allow people to hug her at a cousin's funeral without becoming anxious, which she considered an accomplishment. (*Id*. at 302.) She described her anxiety symptoms as "manageable." (*Id*. )

On October 13, 2017, medical treatment notes from the Far West Center stated that Viccarone displayed with depressed and concerned mood with worried affect, and was seeking treatment for tremors caused by Abilify. (*Id*. at 306.)

On October 30, 2017, Viccarone shared with her counselor that she had recently begun attending Compeer group activities, which had helped her mood. (*Id*. at 310.) She had traveled with

8

Compeer to the zoo, and shared that although she still struggles with anxiety, it is manageable. (*Id*.) She denied any depression symptoms. (*Id*.)

On November 4, 2017, Viccarone told her counselor that she noticed her mood improving and her anxiety symptoms decreasing, but her separation anxiety remained high, she was unable to spend the night anywhere besides her own home. (*Id*. at 312.) She was working on a plan to ease herself into spending the night at her Grandmother's house. (*Id*.) The counselor noted that Viccarone's mood was noticeably improving, as evidenced by smiling, joking, making plans to go out into the community, and dying her hair a brighter color. (*Id*.)

On September 10, 2018, Grace F. Herwig, APRN, completed a Mental Impairment Questionnaire evaluating Viccarone's mental functional capacity. (*Id*. at 272-6.) Nurse Herwig stated she treated Viccarone every one to three months from April 11, 2017 to July 16, 2018. (*Id*. at 272.) Viccarone's medications included 100 mg of Zoloft and .5 mg of Lorazepam, which caused some dizziness, mild sedation, dry mouth, nausea, and headache. (*Id*.) Viccarone had been compliant with treatment. (*Id*.) Nurse Herwig opined that Viccarone suffered from an extreme limitation in her ability to interact with others, marked limitations in her ability to understand, remember, or apply information, and to adapt or manage herself, and moderate limitation in her ability to concentrate, persist, or maintain pace. (*Id*. at 275.) Her conditions had been serious and persistent, lasting for over two years. (*Id*.) She opined that Viccarone had minimal capacity to adapt to changes in her environment or to demands that were not already part of her daily life. (*Id*.) Nurse Herwig opined that Viccarone was not capable of even low stress work, and if she were to attempt to work she would be off-task in excess of twenty-five percent of any given workday, and absent four or more times per month. (*Id*. at 276.) Nurse Herwig based those estimates upon the facts that Viccarone

9

is afraid to leave her own home, even to see family and friends,  and that she has a fear of loud noises.  (*Id*.)

On December 10, 2017, Viccarone had a medication management appointment, and reported to Nurse Herwig that she was still having restless arms, but otherwise was "feeling good in terms of mood," and had been going out with her sister, including trips to the Westside Market and the Rainforest..  (*Id*. at 316.)

On February 16, 2018, Viccarone reported to her counselor that she was able to complete a sleep study away from home without leaving early.  (*Id*. at 320.)

On March 15, 2018, at a medication management appointment, Viccarone had a "brighter" affect and reported "feeling fairly well," getting out more with her family, and enjoying herself.  (*Id*. at 322.)

On March 16, 2018, Viccarone reported to her counselor that she was able to take a job training test at the library alone, and felt her current coping skills were sufficient.  (*Id*. at 324.)

On September 25, 2018, Viccarone reported to her counselor that her mental health symptoms were "manageable," and that she was able to get out and push her boundaries more in public.  (*Id*. at 371.)  Her counselor noted Viccarone had made significant progress.  (*Id*.)

On October 4, 2018, Viccarone reported to her counselor that she had been very upset about not being able to go to the zoo with a Compeer group, and had cried for days.  (*Id*. at  373.)  She had recently attempted to go to the movies with her father and sister, but the noise was too loud.  (*Id*.)

On November 5, 2018, Viccarone reported to her counselor that she was able to get out more, which she enjoyed, but was frustrated that she never gets to do activities she wants because she relied on her father for transportation.  (*Id*. at 375.)

10

On November 19, 2018, Viccarone reported to her counselor that she was getting out of the house more, going to restaurants and movies with her family.  (*Id.* at 377.)  The counselor noted she was smiling, her mood and sleep were good, and her anxiety was down "overall" and she used "benzos" to prepare for leaving home. (*Id.*)

### 2.      Physical Impairments

In July and August of 2017, Viccarone received care for asthma from James T. Corpus, M.D. (*Id.* at 337-41.)  Treatment notes describe Viccarone as fully oriented and exhibiting appropriate affect and demeanor during these treatment visits.  (*Id.* at 338, 341.)

On November 2, 2017, a pulmonary function test conducted by Basem Haddad, M.D., to assess Viccarone's asthma, was suggestive of a mild to moderate degree of restrictive lung disease with normal diffusion capacity. (*Id.* at 329.)

### C.      State Agency Reports - Mental Impairments[4]

State agency reviewing psychologist Cynthia Waggoner, Psy.D., reviewed the record in September 2017. (Tr. 53-57.)  Dr. Waggoner opined that Viccarone's mental impairments did not satisfy the criteria of Listings 12.04, 12.06, and 12.11 because she had only moderate functional limitations.  (*Id.* at 52- 53.)  Dr. Waggoner found that Viccarone had the following limitations to her mental residual functional capacity ("RFC"):

- •      limited to repetitive, short-cycle tasks, and simple decisions;

- •      can relate to coworkers and supervisors on a superficial level;

- •      can handle occasional changes in routine;

---

[4]      Viccarone does not challenge the ALJ's determination regarding her physical impairments, and therefore they are not discussed herein.

11

- limited to a low stress, consistent setting with clear performance expectations and relatively static duties;

- no fast-paced or production quota work; and

- no interaction with the general public in the workplace.

(*Id*. at 56-57.)

In November 2017, state agency reviewing psychologist Jaime Lai, Psy.D., evaluated Viccarone's mental impairments and concluded that Viccarone had marked limitations in interacting with others, but he concurred with Dr. Waggoner's finding that Viccarone did not satisfy the criteria of Listings 12.04, 12.06, and 12.11. (*Id*. at 66-70.) Dr. Lai also affirmed Dr. Waggoner's conclusions about Viccarone's RFC.  (*Id*. at 68-70).

**D.  Hearing Testimony**

During the December 12, 2018 hearing, Viccarone testified to the following:

- She cannot leave her house at all.  (Tr. 36.)

- An incident noted in her counselor's records describing a visit to a friend's house where she witnessed the friend's mother being beaten up was describing an event that happened when she was in grade school.  (*Id*.)

- She goes outside to do yard work with her father.  (*Id*.)

- She has therapy sessions once a month.  (*Id*.)

- She lives with her mother, father and sister in North Olmstead.  (*Id*. at 37.)

- Her father receives disability.  She doesn't know how long he has received it, and isn't sure whether its from Social Security or Workers' Compensation.  (*Id*.)

- Her sister is 27.  (*Id*. at 38.)

- She has two dogs and a Sugar Glider.  She helps care for the dogs by giving them baths and giving them medicine if they need it.  (*Id*.)

12

- She attended public school until the beginning of 11th grade.  At that point, her anxiety became worse, and she finished high school through ECOT online school.  (*Id.*)

- She had a special education IEP from first or second grade until she finished school.  (*Id.*)

- She got tests read to her, and sometimes would have fewer choices on a multiple choice test, or get extra time.  (*Id.* at 39.)

- She uses an inhaler to treat her asthma.  Her breathing is pretty good.  She also has a rescue inhaler.  Cold weather makes her asthma worse.  (*Id.* at 40.)

- Her dad drove her to the hearing, and is in the waiting room.  This makes her feel scared, and she doesn't know what to do.  (*Id.* at 41.)

After both the ALJ and Viccarone's counsel had questioned her, the ALJ noted that the start of the hearing had been delayed, and stated to counsel "this is not a complicated issue.  You've gotten the testimony that you need from the Claimant and the record is pretty complete, as you've indicated."  I'd like to move on to the vocational expert."  (*Id.*)

Viccarone's counsel responded, "Yes, Your Honor."  (*Id.*)

The ALJ then posed the following hypothetical question to the VE:

[T]his is an individual . . . limited to medium exertion . . . avoid jobs that require an individual one-third of the day to be exposed to respiratory irritants /extreme cold/humidity.  And, also because of concern for breathing, avoid jobs that require one to operate dangerous moving equipment such as power saws and jackhammers. . . .

[T]his individual would be limited to simple/routine type of work, no mechanized production pace for time or quantity and is limited to interacting with co-workers and supervisors to speak, signal, ask questions and serve.  This individual should avoid work that requires this type of interaction with the general public, but incidental exposure or interaction with the general public is acceptable.

And what I mean by that is let's say you're a housekeeper, your primary job is not to provide a service to the general public.  Your primary job is to clean rooms, but if a person who is a guest of the hotel happens to come in the room or is walking down

13

the hall, then the individual would have the incidental interaction of saying hello, how are you, good morning.  That's what I mean by incidental.

I don't want customer service.  I don't want waitressing.  I don't want receptionist.  I don't want anything like that. . . .

[W]ith all those limitations and the bases for providing these limitations, can you tell me whether or not there are jobs for such a person?

(*Id*. at 42-3.)

The VE explained the hypothetical individual would also be able to perform representative jobs in the economy, such as furniture assembler, dining room attendant, and produce packer.  (*Id*. at 43-4.)

The ALJ then amended the hypothetical to restrict the individual to jobs that do not have any exposure to the general public.  (*Id*. at 44.)

The VE testified that this would exclude the dining room attendant job, but the jobs of furniture assembler and produce packer could still be performed.  (*Id*.)

The ALJ then amended the hypothetical to add the limitation that the individual was absent one day a month, left work early one day a month, and came in late one day a month.  (*Id*.)

The VE testified that under this hypothetical, no competitive work would be available.  (*Id*.)

In response to questions from Viccarone's counsel, the VE testified that an employee who was off-task at work for more than ten percent of a workday on average could not maintain employment. (*Id*. at 45.)  An employee in need of redirection six to eight times daily also could not maintain competitive employment.  (*Id*.)  Lastly, if an employee needed to bring a family member to work with them for the purpose of support in the workplace, competitive work could not be maintained. (*Id*. at 45-6.)

14

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 & 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

15

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since June 22, 2017, the application date.

2.      The claimant has the following severe impairments: anxiety with agoraphobia; borderline intellectual functioning; and asthma.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listings in 20 CFR Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except avoid jobs that require an individual 1/3 of the day to be exposed to respiratory irritants, extreme cold, humidity. Avoid jobs that require one to operate dangerous moving equipment such as power saws and jack hammers.  mental: limited to simple routine type work, no mechanized production pace for time or quantity.  is limited to interacting with co workers and supervisors to speak, signal ask questions and serve. Should avoid work that requires this type of interaction with the general public.    But incidental exposure or interaction with general public is acceptable. [sic throughout]

5.      The claimant has no past relevant work.

6.      The claimant was born on August **, 1988 and was 28 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.      The claimant has at least a high school education and is able to communicate in English.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 22, 2017, the date the application was filed.

(Tr. 17-27) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision

17

of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

## A.     First Assignment of Error:  Hearing Testimony

Viccarone first asserts that the ALJ erred by ending her testimony at the hearing before she had a chance to elaborate on the testimony she gave at the hearing.  (Doc. No. 16 at 10.)  She asserts that "prematurely ending testimony" deprived her of a substantial right - the right to a hearing - set forth in  C.F.R. § 416.1414.  (*Id*.)  She argues that denying her the right to additional testimony caused the ALJ to make factual errors which could have been avoided had the ALJ questioned her further.  (*Id*.)

The Commissioner responds that Viccarone has waived any challenge to the ALJ's conduct of the hearing upon appeal because her counsel did not object during the administrative proceedings.  (Doc. No. 18 at 10.)  Further, he asserts that her argument is substantively flawed because Sixth Circuit have repeatedly held there is no harmful error in the ALJ enforcing time constraints and ending questioning during a hearing, especially where the claimant's counsel does not object.  (*Id*.)

### i.     Waiver

The Commissioner first asserts that Viccarone has waived any challenge to the ALJ's conduct of the hearing upon appeal because her attorney did not register an objection to ending Viccarone's testimony during the administrative hearing, or at any time during the administrative proceedings. (Doc. No. 18 at 10.)  He cites Sixth Circuit precedent holding a claimant waived any argument stemming from the exclusion of witness testimony at an administrative hearing where she did not object during the administrative proceedings.  *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 809-10 (6th Cir. 2012)   ("[Claimant] had to raise the issue to the agency, and had that opportunity during her administrative appeal to the Appeals Council. Her failure to do so constitutes

19

a waiver.")  Viccarone does not respond to this assertion or address her first assignment of error in

her Reply brief.[5]  (Doc. No. 20.)

    As noted above, after both the ALJ and Viccarone's attorney had questioned her at the

hearing, the ALJ noted that the hearing had begin 25 minutes late because Viccrone's counsel had

been in another hearing, and following exchange occurred:

> ALJ:   I think, for all intents and purposes, this is not a complicated issue.  You've gotten
> the testimony that you need from the Claimant and the record is pretty complete, as
> you've indicated.  I'd like to move on to the vocational expert.
>
> Viccarone's counsel: Yes, Your Honor.
>
> ALJ:   Thank you.  Thank you.

(Tr. 41.)  Viccarone's counsel did not return to the issue of her testimony during the hearing, and

Viccarone does not assert that she raise objections to the ALJ's conduct of the hearing at any time

before the close of her administrative proceedings, including in her appeal to the Appeals Counsel.[6]

Further, Viccarone did not challenge the Commissioner's assertion that challenges to the conduct of

the hearing were waived in her Reply brief in this case.  Therefore, this argument was waived.

---

[5]    Viccrone's argument in her Brief on the Merits rests on the Sixth Circuit's
decision in *Wilson v. Commissioner*.  (Doc. No. 18 at 11.) However, *Wilson* is
inapplicable because it addresses an ALJ's "special duty" to develop the record
under "special circumstances    when a claimant is (1) without counsel, (2)
incapable of presenting an effective case, and (3) unfamiliar with hearing
procedures," which do not exist in this case.  *Wilson v. Comm'r of Soc. Sec.*, 280
F. App'x 456, 459 (6th Cir. 2008).

[6]    Viccarone's Request for Review by the Appeals Counsel states that "The basis for
this request is that the ALJ abused her discretion resulting in errors of fact and
law." (Tr. 116.)  The brief in support of this appeal is not part of the record, and
the Court relies on the representations of the parties that the issue was not raised
therein.

### ii.    Merits

Assuming, *arguendo*, that Viccarone had not waived this argument by failing to raise it before the agency, the assignment of error is without substantive merit.  The Sixth Circuit has made clear that terminating a claimant's counsel's cross-examination, with the counsel's apparent consent, in no way undermines the claimants right to a fair hearing.  In *Young v. Apfel*, the Sixth Circuit explained:

> In this case, [claimant's counsel] was allowed to cross-examine [all testifying witnesses,] and he did so quite extensively. There is no reason to believe that the ALJ's decision would have changed had this line of questioning continued. Indeed, there is no reason to believe that this lost moment undermined [claimant's] right to a fair hearing.

*Young v. Apfel*, 40 F. App'x 157, 164 (6th Cir. 2002).   While the court in *Young v. Apfel* did not specify what constituted "extensive" cross-examination, the record in this case shows that Viccarone's testimony in response to her counsel's cross-examination spanned five pages in the transcript and covered subjects as diverse as her special education accommodations, her activities of daily living, her asthma, and the way her anxiety affected her attendance at the hearing.  (Tr. 37-41.)  At the time the ALJ proposed ending Viccarone's testimony, she had just answered a question asking her to describe the sensation she got when she experienced feelings of separation anxiety.  (*Id*. at 41.)  Her response was "Scared. Not knowing what to do."  (*Id*.)   There is no indiction in the transcript that Viccarone intended to elaborate further, or that her counsel intended to ask additional questions  It was reasonable for the ALJ to believe Viccarone's counsel had the testimony he needed, and Viccarone's counsel appeared to agree with the ALJ's assessment.  In *Pimentel v Commissioner*, the Court held that, even where an attorney objected to the ALJ's enforcement of "arbitrary time constraints" during the hearing, the attorney's failure to bring his concern to the ALJ "in any

21

substantive way," such as through a post-hearing brief, rendered this assignment of error meritless. *Pimentel v. Comm'r of Soc. Sec.*, No. 1:16-CV-2099, 2017 WL 3494339, at *5 (N.D. Ohio Aug. 15, 2017). In contrast to this case, the attorney in *Pimental* not only raised his concerns orally at the hearing, but also sent a letter to the ALJ after the hearing, "complaining again about the time limitations and renewing the request for a supplemental hearing." *Id.* Further, the ALJ's decision provides no basis to conclude that she lacked understanding of Viccarone's self-report of her subjective symptoms. Therefore, even if Viccarone's counsel had preserved this issue through timely objection, it would not have provided ground for remand.

It was reasonable for the ALJ to infer from counsel's verbal response at the hearing that both parties were in agreement that they had sufficient testimony from Viccarone. The ALJ did not fail in his duty to provide a full and fair hearing, and therefore Viccarone's first assignment of error is without merit.

**B.      Second Assignment of Error: Opinion Evidence**

Viccarone next asserts that the ALJ's determination that the opinions of the state agency reviewing psychologists were "partially persuasive" and that the opinion of Viccarone's treating nurse practitioner, Nurse Herwig,  was "unpersuasive" constituted error because it is not supported by substantial evidence. (Doc. No. 16 at 4.) She argues that the ALJ misstated facts and gave insufficient reasons in her explanation of the weight assigned to Nurse Herwig's opinion. (*Id*. at 12.)

The Commissioner asserts that the ALJ had substantial evidence supporting the determination that Nurse Herwig's opinion was less persuasive than the opinions of the state agency reviewing psychologists. (Doc. No. 18 at 11-12.) He notes that the ALJ found Nurse Herwig's statements were inconsistent with her own objective clinical findings and otherwise unsupported. (*Id*., citing Tr.

24-25).  He argues that the ALJ's analysis was consistent with applicable legal authority and cleared the "not high" threshold for evidentiary sufficiency.  (*Id*. at 11.)

Since Viccarone's claim was filed after March 27, 2017,[7] the Social Security Administration's new regulations ("Revised Regulations")  for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[8] (2) consistency;[9] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding

---

[7] Viccarone's claim was filed June 22, 2017.  (Tr. 15.)

[8] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[9] The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

23

of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The Social Security Agency's express intention in adopting the Revised Regulations was to re-focus judicial review on the critical issue of whether an ALJ's decision was supported with substantial evidence.[10] Therefore, Viccarone's claim that the ALJ's RFC determination is not supported by substantial evidence falls squarely within both the letter and the intent of the Revised Regulations.

The ALJ addressed Nurse Herwig's opinion as follows:

Grace F. Herwig, APRN, offered an opinion regarding claimant's functioning on September 10, 2018 on a form entitled "Mental Impairment Questionnaire". Ms. Herwig opined that the claimant experienced marked limitations in understanding, remembering, or applying information, extreme limitation in interacting with others, moderate limitation in concentrating, persisting, or maintaining pace, and marked limitation in adapting or managing oneself. She noted that the claimant was not

---

[10]     The stated rationale for the revision included the concern that:

> Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision. As the Administrative Conference of the United States' (ACUS) Final Report explains, these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standards of review, which is intended to be highly deferential standard to us.

82 Fed. Reg. at 5853; see 81 Fed. Reg. at 62,572

receiving medical treatment, mental health therapy, psychosocial supports, or a highly structured setting, but said she believed the claimant's mental disorder is "serious and persistent." She believed that the claimant has minimal capacity to adapt to changes in her environment or to demands that are not already a part of her life. Ms. Herwig's opinion of marked and extreme limitations across all four areas of mental functioning is highly inconsistent with the evidence of record, including Ms. Herwig's own treatment records, which contain mental status observations that the claimant is cooperative, euthymic, has memory within normal limits, and has fair motivation and energy. The undersigned finds that this opinion, although from one of the claimant's treating providers, is not supported by the record and is therefore unpersuasive.

(Tr. 24-5) (internal citations omitted).

Viccarone notes that the ALJ's statement that Nurse Herwig found "marked and extreme limitations across all four areas of mental functioning" misstated Nurse Herwig's opinion, which opined that she had a moderate limitation in her ability to concentrate, persist, and maintain pace. (Doc. No. 16 at 12-13, citing Tr. 275.) This is true, although a harmless error as the ALJ correctly stated Nurse Herwig's opinion a few sentences earlier. She next argues that the ALJ's focus on all the areas of mental functioning "omits the key issue in the case," because Viccarone based her disability claim on "extreme agoraphobia and separation anxiety," not "a mood or motivation issue." (*Id*. at 13.)

It is the duty of the ALJ to throughly assess all areas of Viccarone's mental functioning, even when the only severe impairments identified are "anxiety with agoraphobia" and "borderline intellectual functioning." (Tr. 17.) Further, Nurse Herwig's repeated record notations of euthymic mood and cooperative demeanor are relevant to her opinion that Viccarone has extreme limitation in interacting with others. Nurse Herwig's repeated record notations that Viccarone exhibited normal memory and thought processes and fair motivation are relevant to her opinion that Viccarone had marked limitations in understanding, remembering, or applying information; and moderate limitation

26

in concentrating, persisting, or maintaining pace.

Earlier in her Decision, the ALJ throughly summarized the course of Viccarone's treatment with Nurse Herwig, and although the paragraph devoted to her opinion uses some formulaic language, it references the much more detailed and specific summary the ALJ previously provided. (Tr. 22.) She directly addressed the impairments of anxiety and agorophobia in that section, noting that Nurse Herwig's treatment records:

> indicate that the claimant "pushed' herself to attend family gatherings, help her grandmother with yard work, and go to ... public places with family members. She usually reported manageable anxiety symptoms, although treatment notes indicate she occasionally had difficulty tolerating loud noises at the movies, or her anxiety in public places. These records show the claimant was somewhat reluctant to address her fear of separation from her father or other family members, but was attending appointments without having a family member in the room.

(Tr. 22.) The ALJ was not obligated to restate these findings two pages later when she addressed the medical opinion evidence, and her decision not to do so in no way indicates that she omitted consideration of Viccarone's anxiety and agorophobia, which she had earlier identified as severe impairments.

Viccarone's assignment of error regarding the ALJ's designation of both state agency reviewing psychiatrists as "partially persuasive" rests solely on the assertion that the ALJ "cites minimal reasoning as to why she found the opinions of the consultants to be entitled to greater weight than APRN Herwig." (Doc. No. 16 at 13.) The ALJ's explanation of her treatment of the state agency reviewers shared opinion is in fact detailed and specific, explaining, in part:

> The state agency psychological consultants' shared opinion is only partially persuasive because of the imprecise terminology they use regarding the claimant's functional limitations. Specifically, their description of "a low stress, consistent setting with clear performance expectations," and capability finding that the claimant can 'remember simple and multistep tasks that are not complex" are not consistent

27

> with job requirements found in the Directory of Occupational Titles, and other terminology used in the field of vocational rehabilitation. Additionally, the undersigned notes that Dr. Lai rated the "paragraph B" area of interacting with others as marked, and provided no reasoning in support of this conclusion, nor any explanation of why this change in her assessment of "paragraph B" limitations had no impact on her finding regarding the claimant's mental residual functional capacity.

(Tr. 24.) The core of Viccarone's argument seems to be that the ALJ should have found Nurse Herwig's opinion more consistent with the record as a whole than the opinions of the state agency reviewers. Even if true, this would not provide a basis to hold that the ALJ erred in finding the state agency reviewers' opinions "partially persuasive." Further, it is not this Court's role to reweigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The ALJ's treatment of the medical opinion evidence appropriately applied the Revised Regulations and was supported by substantial evidence. Therefore, this assignment of error is without merit.

## C.     Third Assignment of Error: Listing 12.06

Viccarone next asserts the ALJ committed an error of law and the Decision is not supported by substantial evidence because the ALJ improperly concluded that Viccarone does not satisfy "paragraph B" criteria of Listing 12.06. (Doc. No. 16 at 4.) She asserts that the ALJ's "paragraph B" analysis was "flawed" because " the substantial weight of the evidence in the record suggests that [Viccarone] is subject to at least two marked limitations, and possibly an extreme limitation in the domain of interacting with others, " and "the ALJ gives scant analysis concerning why [Viccarone] does not meet or equal a listing." (Doc. No. 16 at 14-15.)

The Commissioner asserts that the ALJ's finding that Viccarone did not satisfy all of the requisite criteria of Listing 12.06 was consistent with relevant legal authority, was supported by

28

substantial evidence, and was adequately explained by the detailed summary of Viccarone's treatment records and self-reporting about her functional abilities found earlier in the decision. (Doc. No. 18 at 18.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011); *Brauninger v. Comm'r of Soc. Sec.*, No. 18-3495, 2019 WL 2246791 at *5 (6th Cir. Feb. 25, 2019). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17.

Here, the ALJ determined, at step two, that Viccarone suffered from the following severe impairments: anxiety with agoraphobia; borderline intellectual functioning; and asthma. (Tr. 17.) The ALJ then proceeded, at step three, to find Viccarone did not meet or equal the "paragraph B" requirements of Listing 12.06,[11] as set forth in detail below.

Viccarone argues that the ALJ erred in finding she did not meet the "paragraph B" criteria of Listing 12.06. In order to satisfy the "paragraph B" criteria of the Listing 12.06, Viccarone must exhibit "marked" or "extreme" functional limitations in two or more of the following categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing onself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A(2)(b); *Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 372 (6th Cir. 2017); *Vecchio v. Comm'r of Soc. Sec.*, 1:16 CV 751, 2017 WL 2644129 at * 7 (N.D. Ohio Apr. 28, 2017). To establish a "marked" limitation in any of these areas, the claimant's impairment must "seriously interfere with the ability to function independently, appropriately, and effectively." *See Foster v.*

---

[11]     Viccarone limits her assignment of error to the ALJ's analysis of two of the "paragraph B" requirements, and therefore this Court's review does not address other aspects of Listing 12.06.

30

*Bowen*, 853 F.2d 483, 491 (6th Cir. 1988); *Harvard v. Comm'r of Soc. Sec.*, No. 1:13CV2464, 2015 WL 506976 at *14 (N.D. Ohio Feb. 6, 2015).  Viccarone specifically asserts that the ALJ erred in not finding at least a "marked" limitation in the categories of interacting with others and adapting or managing herself.

The Court will discuss Viccarone's arguments with respect to the two categories she asserts were improperly analyzed by the ALJ separately, below.

### i.      Interacting with others

Regarding interacting with others, the regulations provide as follows:

> This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(2).

The ALJ addressed the"paragraph B" criteria of interacting with others as follows:

> *In interacting with others, the claimant has moderate limitations*.  On the Function Form that the claimant completed, she said that she has no problem getting along with family, friends, neighbors and others, but said that she does not go places and has to have a family [member] with her at all times.  She said that she gets along "really well" with authority figures.  Far West Center treatment notes consistently describe the claimant as cooperative.  The claimant's difficulties in this area manifest primarily in dependance on her family members to accompany her when she leaves her home.  The claimant is able to interact appropriately with peers and adults, although her anxiety sometimes interferes with her willingness to interact with people other than family members.  Overall, the record support[s] the finding that experiences a moderate limitation in this area; she retains a full capacity to interact with others appropriately, but her ability to independently initiate and sustain interaction with people other than family members is no more than fair.

31

(Tr. 19) (italics in original) (internal citations omitted).

Viccarone notes that Nurse Herwig, whose opinion is discussed at length in section VI.B., *supra*, opined that Viccarone had an extreme limitation in her ability to interact with others.  (Doc. No. 16 at 15.)  She asserts that there is no record evidence supporting the finding that she can interact with others on an independent or sustained basis, and that, in fact, she is incapable of leaving her home with being accompanied by a family member.  (*Id*.)

Although Viccarone identifies evidence that could support finding a more severe restriction, substantial evidence supports the ALJ's determination that Viccarone has a moderate restriction in interacting with others.  As the ALJ pointed out, Viccarone denied experiencing difficulties with getting along with others in a July 2017 Function Report (Tr. 18-19, 155-56.)  The ALJ expressly acknowledged Viccarone's testimony that she experiences separation anxiety and needs a family member with her at all time. (*Id*. at 19.)  However, there is also substantial evidence in the record showing Viccarone had a strong relationship with her family, particularly her grandmother, her parents and her sister, and was able to go out in public with them, and also engage in Compeer trips, public outings that the record does not reflect included family members.  (*Id*. at 310, 316, 373.) Specifically, Viccarone testified she went out shopping and ate in restaurants with her parents and sister, and went to the zoo with Compeer. (*Id*. at 316, 310.) She also completed an overnight sleep study away from home, and the record does not reflect that a family member stayed with her. (*Id*. at 320.)  Although Viccarone informed her counselor at the Far West Center that she had not left her home for approximately a year when she began treatment there in April 2017, the relevant period for this application begins on June 22, 2017, and Far West Center treatment notes document that, by that date, Viccarone was leaving her house to attend regular therapy.  (*Id*. at 263, 282, 284, 290, 294.)

32

Treatment notes also reflect that she was making social outings in the community, such as trips to her grandmother's house, a trip to view fireworks, and a visit to her cousins within two months of filing her application for SSI.  (*Id.*)  Finally, as the ALJ noted, mental status examinations routinely noted that Viccarone was cooperative, with good eye contact. (*Id.* at 22-25, *see, e.g.*, Tr. 282, 284-88, 290, 292, 300-02, 304, 308, 310, 312, 314, 316-18, 320, 322-24, 338, 341, 371, 375, 377-79.) While there is evidence in the record to support Viccarone's argument, the Court finds, based on the above, that the ALJ's finding of moderate limitations in this area is supported by substantial evidence. *See, e.g., Primmer v. Comm'r of Soc. Sec.*, No. 2:14-cv-2245, 2015 WL 9474691 at *2-3 (S.D. Ohio Dec. 29, 2015) (finding substantial evidence supported ALJ's determination of moderate limitations in social functioning where, although the claimant had difficulty around others and panic attacks, she was "able to go to the store with her sister-in-law, ... attended doctor's appointments on a regular basis, ... reported talking with others on a daily basis and regularly interacting with family"); *Gonzalez v. Comm'r of Soc. Sec.*, No. 13 11772, 2014 WL 3735249 at *12 (E.D. Mich. July 29, 2014) (finding substantial evidence supported ALJ's determination of moderate limitations in social functioning where, although the claimant avoided interpersonal relationships and isolated herself, she was able to interact successfully with people when shopping and using public transportation and treatment records indicated she was consistently cooperative and polite).

### ii.     Adapting or managing oneself

Regarding adapting or managing oneself, the regulations provide as follows:

This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining

personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(4).

The ALJ addressed this criteria as follows:

> *As for adapting or managing oneself, the claimant has experienced a moderate limitation.* On the function form the claimant completed, she says that she does not handle stress or changes in routine well. She indicated that she has no need for reminders to perform her personal grooming or to take medication. The claimant's primary care provider included a note in the claimant's office visit of August 30, 2017, indicating that she had not followed through on his prescription for pulmonary function testing, and when asked why, she was unable to provide an explanation. Far West Center treatment notes consistently described the claimant as well-groomed. These notes occasionally contain findings that the claimant is visibly anxious, and the content of the notes shows that the claimant reports needing to take anti-anxiety medications to leave her home. These records show that the claimant's anxiety interferes with the claimant's performance of a full range of independent activities in the community, resulting in moderate limitation in the area of adapting and managing oneself.

(Tr. 19) (italics in original) (internal citations omitted).

Viccarone argues that she has a marked limitation in her ability to adapt and manage herself for the same reasons that she has at least a marked impairment in her ability to interact with others. (Doc. No. 16 at 20.) Again, although evidence exists in the record which could support a finding of more severe impairment, substantial evidence supports the ALJ's determination Viccarone has a moderate limitation in the category of adapting oneself. The ALJ acknowledged Viccarone's reports that she does not handle with stress or changes in routine well. (Tr. 19.) However, the ALJ assessed moderate restrictions in this category based on Viccarone's ability to independently perform self-care activities such as dressing and bathing and taking her medications. (*Id.*) The ALJ noted that the record reflects that Viccarone's Far West Center treatment providers consistently reported that she

34

had normal self-care, activities of daily living, appearance, attitude, mood, speech, memory, thought processes, thought content, and insight.  (*Id*. at 18-19, 22-25, *see, e.g.*, Tr. 282, 284-88, 290, 292, 300-2, 304, 308, 310, 312, 314, 316-18, 320, 322-24, 338, 341, 371, 375, 377-79.)  The ALJ also noted that treatment  notes also reflect that Viccarone reported that she was able to engage in a variety of activities inside and outside of her home, such as caring for herself and her pets, preparing meals for her mother, attending community events, performing yard work, watching television, visiting her grandmother's home and movie theaters, running errands with her parents, eating in restaurants, shopping in stores and online, and taking a job training test.  (*Id*. at 18-19, 22-23, *see, e.g.*, Tr. 152-54, 282, 285, 287, 290, 292, 308, 312, 314, 318, 322, 324, 371, 373, 375.)  In her Function Report, Viccarone reported that she was able to care for herself, prepare her own meals, take medicine without reminders, shop for clothes and food in stores and online, and listen to music. (*Id*. at 151-54.)  She also reported that she bathed her pets and could give them medicine, but her sister walked the pets and fed them. (*Id*. at 151.) Contrary to Viccarone's assertions, it is not clear from the record that she was always accompanied by a family member while engaging in these activities.  For example, the record indicates she completed a sleep study independently, requiring her to stay overnight in an unfamiliar setting; took a job training test in the library alone; and enjoyed Compeer trips, which appear to be peer outings without family participation.  (Tr. 310, 320, 324.)

In sum, "[b]ecause the ALJ reached [her] decision using correct legal standards and because those findings were supported by substantial evidence, the Court must affirm it, even if reasonable minds could disagree on whether the individual was disabled or substantial evidence could also support a contrary result." *Postell*, 2018 WL 1477128 at * 10 (citing *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)); *see also Longworth v. Comm'r of Soc. Sec*., 402 F.3d 591, 595 (6th Cir.

2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). As noted *supra*, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035. For all the reasons set forth above, the Court concludes the ALJ's findings herein are within that "zone of choice."

Accordingly, it is recommended the Court find the ALJ did not err in finding, at Step Three, that Viccarone's impairments do not meet or equal the requirements of Listing 12.06.

**D.      Fourth Assignment of Error: SSR 96-8p**

Viccarone's fourth assignment of error asserts the ALJ erred by failing to follow the requirements of SSR 96-8p when determining Viccarone's RFC, and that the RFC is not supported by substantial evidence because it does not accommodate the psychological limitations associated with Viccarone's inability to remain on-task in the workplace, attend work on a regular basis, and leave her home without the presence of a family member. (Doc. No. 16 at 20.)

The Commissioner responds that the ALJ properly evaluated Viccarone's subjective symptom testimony, and had substantial evidence for his determination that her psychiatric symptoms and limitations were not disabling. (Doc. No. 18 at 19.)

SSR 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess her work-related abilities on a function-by-function basis. *Id.* Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports,

36

lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id.* However, as the Sixth Circuit explained, "[a]lthough SSR 96 8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002); *citing Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00 1995 (3d Cir. Dec. 19, 2000); *see also Lawson v. Apfel*, No. IP 99 1112 C H/G, 2000 WL 683256 (S.D. Ind. May 25, 2000); *Lam v. Apfel*, No. Civ. A. 3:99 CV 2203, 2000 WL 354393 (N.D. Tex. Apr. 5, 2000); *Morphew v. Apfel*, No. IP 99 655 C H/G, 2000 WL 682661 (S.D. Ind. Feb. 15, 2000); *Nikulin v. Apfel,* No. 97 C 3631, 1997 WL 688878 (N.D. Ill. Oct. 28, 1997).

Viccarone asserts that the ALJ's RFC finding failed to take into account her inability to function when not in close proximity to a family member. (Doc. No. 16 at 17.) She cites record evidence that supports this limitation, and argues that the record evidence cited in support of the ALJ's RFC documents Viccarone's mental state when a family member was present and is therefore irrelevant as to providing any insight into potential independent workplace behavior. *Id.*

However, it is not error for the ALJ to evaluate a claimant's claims of extreme mental limitations in the context of her normal appearance, attitude, mood, speech, memory, thought processes, thought content, and insight during clinical examinations, although she "struggles with separation anxiety at times." (Tr. 18-19, 22-25.) *See McDaniel v. Saul*, No. 3:18-cv-2071, 2020 WL 511988, at *15-16 (N.D. Ohio Jan. 30, 2020) (the ALJ properly discounted the claimant's psychiatric symptom testimony by citing her "good" moods, intact concentration, and appropriate insight and affect during examinations). The ALJ also properly noted the inconsistency between Viccarones's

37

subjective claims of disability and her self-reports that she did not have difficulties in memory, concentration, understanding, following instructions, and getting along with others.  (Tr. 18-19, 23, 155-56.)  Nor, as discussed *supra*, is it clear from the record that Viccarone was always accompanied by a family member when she left her home.  (Tr. 310, 320, 324.)  Substantial evidence supports the ALJ's determination that Viccarone's symptoms improved with treatment, and therefore were not of a disabling severity for a twelve-month duration during the relevant period.  (Tr. 22-23). *See* 20 C.F.R. §§ 416.929(c)(3)(iv), (v); *Reeves v. Comm'r of Soc. Sec.*, No. 5:18-cv-1425, 2019 WL 1923332, at *16 (N.D. Ohio Apr. 30, 2019) (the ALJ properly rejected the claimant's allegations of disabling psychiatric symptoms where she reported improved symptoms with treatment).

The Court acknowledges there is medical evidence in the record that supports Viccarone's argument. However, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.  Here, for the reasons discussed above, the Court finds the ALJ's conclusion that Viccarone's reported symptoms are inconsistent with the objective medical evidence is reasonable and supported by substantial evidence in the record, and the RFC accurately reflects her conclusions.  Accordingly, it is recommended the Court find this assignment of error is without merit.

## E.     Fifth Assignment of Error: SSR 16-3p

Viccarone's final assignment of error asserts that the ALJ erred by failing to follow SSR 16-3p when assessing her credibility, and that the ALJ's credibility finding is not supported by substantial evidence.  (Doc. No. 16 at 23.)

The Commissioner responds that the ALJ properly applied the all applicable regulations in

38

evaluating Viccarone's subjective symptoms, and substantial evidence supports her RFC determination.  (Doc. No. 18 at 22.)

SSR 16-3p concerns treatment of a claimant's subjective complaints.  The Sixth Circuit has described the purpose of SSR 16-3p as ending "the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). Under SSR 16-3p, "an ALJ must focus on the consistency of an individual's statements about the intensity, persistence and limiting effects of symptoms, rather than credibility." *Jidas v. Comm'r of Soc. Sec.*, No. 17-14198, 2019 WL 2252289, at *8 (E.D. Mich. Feb. 26, 2019) (citation omitted).

Viccarone's argument is again premised on the assertion that "record clearly indicates the [Viccarone] is incapable of functioning outside her home without the presence of a close family member."  (Doc. No. 16 at 24.)  As discussed at length *supra*, this Court does not believe that statement accurately reflects the record.  Viccarone asserts that the ALJ improperly picked and chose only evidence that supported her conclusion that Viccarone's mental health symptoms improved significantly with treatment.  (*Id*.)  However, the ALJ acknowledged Viccarone's self-reports of disabling symptoms and addressed opinion evidence that supported a finding of greater limitations, as discussed in depth in the preceding sections of this opinion.[12]  Further, the ALJ supported her

---

[12]     Viccarone also points to a June 2016 opinion from consultative psychological examiner Dr. Koricke as support for the inclusion of additional limitations in the RFC.  (Doc. No. 16 at 18.)  However, ALJ appropriately rejected this opinion because it was issued in the context of a prior SSI application and thus not relevant to the period under adjudication here in this case, particularly given that the ALJ's determination was rooted in the finding that Viccarone's symptoms improved with treatment. (Tr. 24). *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535-36 (6th Cir. 2001) (holding that a physician's report that predated the relevant period did not justify reversal).  Further, as noted by the Commissioner,

opinion with the "partially persuasive" opinions of the state agency reviewing psychologists, who essentially concurred that Viccarone could perform a range of simple work, and ultimately adopted an RFC more restrictive than that adopted by the state agency reviewers.   (Tr. 24, 55-57, 68-70.) *See* 20 C.F.R. § 416.913a(b)(1) ("our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation")

For all the reasons set forth above, it is recommended the Court find this assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 22, 2021

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

Viccarone did not challenge the ALJ's treatment of this opinion.  (Doc. No. 18 at 23.)

40